**AVIATION SALES CORPORATION,**
**Plaintiff,**

v.

**CANADA ITW LIMITED and Illinois**
**Tool Works Inc., Defendants.**

**Civ. A. No. 71 C 1476.**

United States District Court,
E. D. New York.

Aug. 7, 1972.

Leinwand, Maron, Hendler & Krause, by Irving M. Maron, New York City, for plaintiff.

Debevoise, Plimpton, Lyons & Gates, New York City, and Gardner, Carton, Douglas, Chilgren & Waud, by Robert B. von Mehren, New York City, and Joe A. Sutherland, Chicago, Ill., for defendants.

MEMORANDUM AND ORDER

NEAHER, District Judge.

Plaintiff Aviation Sales Corporation, a New York corporation having its place of business in this district, commenced

this action for alleged breach of contract seeking recovery of damages in excess of the federal jurisdictional amount. Defendant Canada ITW Limited ("CITW") is a Canadian corporation having its place of business in Ontario, Canada. CITW was incorporated as a wholly-owned subsidiary of co-defendant Illinois Tool Works, Inc. ("ITW"), a Delaware corporation having its principal office in Chicago, Illinois, and a regional sales office in New York. Jurisdiction is grounded on diversity of citizenship, 28 U.S.C. § 1332.

Defendant ITW has accepted jurisdiction by appearing generally and filing its answer to the complaint. Defendant CITW, however, challenges the existence of jurisdiction over its person by motion before answer under Rule 12(b) (2) and (5), F.R.Civ.P., seeking dismissal of the complaint as against it and quashing of the service of process made by mail to its office in Ontario, Canada. That challenge requires the court to undertake the never easy task of predicting how a New York State court would apply the relevant State jurisdictional statute to the particular facts and circumstances relating to CITW, a nondomiciliary corporation which does not itself appear to be doing business in New York in the traditional sense.

The relevant statute, N.Y. CPLR § 302(a) (1) (McKinney 1972), provides in pertinent part that:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nondomiciliary, or his executor or administrator, who in person or through an agent:
>
> 1. transacts any business within the state.

If CITW is subject to personal jurisdiction under § 302(a) (1), service of process upon it in Canada by mail dispatched by the clerk of the court—which was done here—would be proper under Rule 4(e) and (f), (i), F.R.Civ.P., and the motion addressed to the sufficiency of service would fail. The critical question for decision is whether under New York law CITW transacted "any business" in New York out of which plaintiff's causes of action may fairly be said to have arisen. The answer to that question requires consideration of the entire transaction between the parties. See Collateral Factors Corp. v. Meyers, 39 A.D.2d 27, 330 N.Y. S.2d 833 (1st Dept. 1972).

Admittedly there were transactions between plaintiff in New York and CITW in Canada growing out of a business agreement between them which began around September 1967 and endured some four years until the agreement was finally terminated by CITW in September 1971. Plaintiff, whose place of business is in Richmond Hill, Queens, has for some years been engaged in selling parts for military and commercial aircraft to customers here and abroad. CITW, through its Licon Division, sells electric switches and components which it manufactures at its plant in Don Mills, Ontario (Toronto). These include a landing gear switch supplied to the Canadian manufacturer of the F–104 airplane used by the Canadian Air Force.

Plaintiff, having received an inquiry from a German customer responsible for technical procurement data for the German Air Force, and learning of CITW's manufacture of the F–104 landing gear switch, made contact with CITW with a view to promoting the use of that switch on the German F–104 and by other foreign governments and foreign aircraft manufacturers. Plaintiff's president, Jack Dadourian, visited CITW's plant in Ontario in August 1967 and placed an initial order for the manufacture of a supply of the F–104 landing gear switches. As a result of a meeting between him and CITW's then vice president and managing director, Fred Ballentine, an agreement was admittedly made at that time whereby CITW appointed plaintiff its exclusive sales representative for designated F–104 landing gear switches outside of Canada, excluding business with Fiat of Italy.

The agreement was confirmed by a letter from Mr. Ballentine to plaintiff in New York, dated September 1, 1967, which stated:

"You will establish a credit to Canada Illinois Tools, Ltd. of twenty-two thousand U.S. dollars ($22,000.00) at the Canadian Imperial Bank of Commerce within two weeks. When that credit is established, we will purchase the balance of materials required to complete your entire order. Shipment of finished products to the amount of $22,000. U.S.F. will apply against that credit. The balance of the order to be shipped on the usual terms, net 30 days.

"Further, we will agree to protect your exclusive sales interest outside of Canada, excluding our business with Fiat of Italy- on F104 landing gear switches # 740045 and # 740046. *Orders or inquiries on these parts, other than the exceptions mentioned, will be forwarded to your company for handling.*

"During our talks, I suggested a working arrangement with Licon Division of I.T.W. which would give you a broad range of approved military and aircraft switches. As such, I have talked with Gene Connelly, General Manager of that division who would be interested in talking with you." (Emphasis supplied.)

In early January 1968, after having sent sets of parts drawings to plaintiff, Mr. Ballentine visited plaintiff's place of business in New York for a meeting with Mr. Dadourian and other employees of plaintiff. He brought with him sample units of the parts involved "done up like jewels" so that plaintiff "can demonstrate and the customer can see the inner workings being actuated." The meeting lasted four hours and Mr. Ballentine returned to Ontario the same day. This was his only visit to New York "in connection with the Aviation Sales Corporation account."

While the parties' affidavits are in conflict as to whether or not another CITW representative brought additional switches and drawings to New York in April 1968, there is no dispute that continuous and extended communication by correspondence and telephone occurred between them during the course of their relationship and that CITW referred inquiries it received to plaintiff for handling. Nor is there any question that although CITW made shipment of the F–104 switches from its plant in Canada directly to plaintiff's customer or designee abroad, inspection as well as shipping documents were provided by CITW to plaintiff in New York so plaintiff could satisfy the customer's requirement for proof of approval by the proper authority as a condition for acceptance and payment.

Plaintiff's claims which give rise to this action grow out of a series of transactions occurring in late 1970 and the first half of 1971 which appear to be directly related to the parties' agreement. Exhibits annexed to the complaint document that plaintiff obtained from the NATO Maintenance and Supply Agency, Coblenz, Germany, an order for 1,500 CITW landing gear switches, calling for delivery in specified quantities monthly from January through November 1971. The gross value of the order was $118,230 U.S. Two other orders, having a gross value of $138,943 U.S., were obtained from another German customer, Messerschmitt-Bolkow-Blohm ("MBB") of Munich, one received by plaintiff in October 1970 and the other in March 1971. Plaintiff placed these several orders with CITW's Licon Division which admittedly accepted them, payment on "usual terms", delivery in installments over time periods extending into the late summer of 1972, and shipments to be made FOB Ontario, Canada, directly to the customers in Germany.

Admittedly, CITW made only partial shipment on two of the three orders above mentioned and notified plaintiff it would not make any delivery of the MBB March 1971 order. This action on CITW's part was based on its claim that plaintiff was in default for failure to

pay for the products ordered in accordance with the agreement between the parties. Plaintiff denies any breach of contract and claims that CITW breached the exclusive sales agreement by later accepting an order directly from MBB for 1400 F–104 switches at a lower quoted price, on which it has already made part delivery, and by frustrating the culmination of efforts already begun by plaintiff to promote the use of the CITW F–104 switch on aircraft of the Japan Air Force.

A complete rupture of the relationship between the parties occurred when CITW, by letter dated August 12, 1971, wrote plaintiff:

"With reference to our Agreement dated September 1, 1967, authorizing your company to act as our agent in the sale of F–104 landing-gear switches, we regret to advise as follows:

"In view of your continuing financial problems, and MBB's desire to deal direct with Licon, we hereby elect to terminate our arrangement effective the date of this letter."

When plaintiff protested the termination, he was referred to co-defendant ITW's officials, five of whose top officers are also the principal officers of CITW, and three of whom comprise a majority of CITW's five directors.

Two meetings with plaintiff were held in September 1971 for the purpose of reaching and implementing "a satisfactory commercial compromise", first in Canada at CITW's office and thereafter in New York at the office of plaintiff's counsel. The first meeting was attended by Silas S. Cathcart, president of CITW and also chief executive officer of ITW, other representatives of ITW and CITW and plaintiff. The second meeting, in New York, was attended by J. Earl Templeton, a group vice-president of ITW but not an officer of CITW, and William L. McGuire, Esq., general counsel of ITW but acting also for CITW. A resolution of the dispute was not achieved, however, and this lawsuit followed.

To be subject to personal jurisdiction under CPLR § 302(a) (1), a nondomiciliary defendant need not be physically present in the state. Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d 13, 17, 308 N.Y.S.2d 337, 340, 256 N.E.2d 506 (1970). It is necessary to find only that "the nonresident defendant has engaged in some purposeful activity in this State *in connection with the matter in suit.*" Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc., 15 N.Y.2d 443, 457, 261 N.Y.S.2d 8, 18, 209 N.E.2d 68, 75, cert. denied, Eastwing Mfg. Co. v. Singer, 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965) (emphasis supplied). A "single transaction in New York out of which the cause of action has arisen" may suffice to fulfill that requirement. *Id.* And if the plaintiff's claim is based upon a contract between the parties, it is not necessary that the contract actually have been made in New York. *Id.* See also Collateral Factors Corp. v. Meyers, *supra*, 39 A.D.2d 27, 330 N.Y.S.2d 833, 835. Did CITW engage in "purposeful activity" in New York "in connection with the matter in suit" within the meaning of § 302? The court concludes that it did.

There can be no doubt that CITW's admitted appointment of plaintiff as its exclusive sales representative for the designated F–104 parts created a business relationship between the parties for a common business purpose. That purpose contemplated and did in fact result in activities by plaintiff in New York and elsewhere in furtherance of the common objective: the opening up of markets outside Canada (and excluding CITW's business with Fiat of Italy) for CITW's designated products. In furtherance of the undertaking, CITW itself sent drawings and working models to plaintiff in New York. The importance of the undertaking and the benefits to be gained are reflected in the fact that CITW sent its top operating official, Vice-President and Managing Director Ballentine, to plaintiff's place of business in New York for the purpose of getting the enterprise under way.

As time went on, CITW admittedly forwarded to plaintiff in New York inquiries from prospective customers, all in accordance with CITW's obligation under the agreement; and engaged in extensive written and telephonic communication with plaintiff in New York. And, as customers materialized in the form of the substantial orders obtained from Germany through plaintiff's efforts, CITW was obliged to forward to plaintiff in New York—and presumably did so—the necessary inspection and shipping documents. It is difficult to view CITW's cooperative activities, so clearly designed to promote the sale of its products outside Canada through the contacts and efforts of plaintiff in New York, as anything other than purposeful activity having a "substantial connection" with New York. *Longines-Wittnauer, supra,* 261 N.Y.S.2d at 19, 209 N.E.2d at 76.

The undisputed facts outlined above simply do not coincide with CITW's view that this is a "one visit" case or its attempt to assimilate it with McKee Electric Co. v. Rauland-Borg Corp., 20 N.Y.2d 377, 283 N.Y.S.2d 34, 229 N.E.2d 604 (1967) as authority "directly in point" against jurisdiction. As already noted, a business transaction of the duration and nature of the one here involved cannot be examined with tubular vision—"the entire transaction must be considered." Collateral Factors Corp. v. Meyers, *supra,* 330 N.Y.S.2d at 835.

On close reading the salient facts in *McKee Electric, supra,* are materially different from those here. Aside from the typical manufacturer-distributor relationship there involved, the single stop-off visit by the defendant's representative was but an incidental effort to help the distributor resolve friction with *his* customers. 283 N.Y.S.2d at 36, 229 N.E.2d at 606. The case was readily distinguished by Chief Judge Fuld in *Parke-Bernet Galleries, supra,* as one in which the "plaintiff was relying on his own activities within the State, and not those of the defendant, as the basis for jurisdiction." 308 N.Y.S.2d at 341, n. 2, 256 N.E.2d at 509.

Mr. Ballentine's visit in this case, on the contrary, was directly related to the purposes of the exclusive sales representation agreement the parties had just concluded. Although that agreement referred to "orders" placed by plaintiff, no F-104 parts were ever shipped to plaintiff. CITW's products went directly to the customers plaintiff obtained through efforts originating in New York pursuant to the agreement. To sustain personal jurisdiction, it was not necessary for Mr. Ballentine to have done anything more than he described in his affidavits on CITW's motion. "'In the broadest sense, a piece of business is transacted within this State when an individual or corporation is within or enters this State in person or by agent and, through dealing herein with another, effectuates or attempts to effectuate herein a purpose directly related to his economic affairs or, if a corporation, to its corporate ends.'" A. Millner Company v. Noudar, Lda., 24 A.D. 326, 266 N.Y.S.2d 289, 295 (1st Dept. 1966).

Here, additionally, the activities of plaintiff in New York, as exclusive sales representative for the designated parts, may also "be considered as being those of the defendant." Schneider v. J and C Carpet Co., 23 A.D.2d 103, 258 N.Y.S.2d 717, 719 (1st Dept. 1965). See to the same effect, Collateral Factors Corp. v. Meyers, *supra,* 330 N.Y.S.2d at 835, 837.

The court's conclusion in *Schneider, supra,* is apposite and is adopted as the conclusion here, *viz.,*

"Since the performance of the contract constituted the requisite transacting of business, the instant action—bottomed on the alleged breach of that contract—arose therefrom and the elements necessary for jurisdiction under CPLR § 302 are present."

In view of that conclusion it is unnecessary to rule upon plaintiff's further contentions that CITW is amenable to jurisdiction under CPLR § 301 because its parent, ITW, is doing business here and CITW itself is engaging in business activities in New York which amount to

"doing business" in the traditional sense.

■ One further matter remains for consideration. "The final standard for jurisdiction is reasonableness—whether the defendant is unfairly burdened by the compulsion to contest a suit in a forum outside his domicile." Elman v. Belson, 32 A.D.2d 422 (2d Dept. 1969), 302 N.Y.S.2d 961, 965. No unfairness to CITW will result from the denial of its motion. Indeed any other decision would impose on plaintiff the added expense and inconvenience of waging this lawsuit against the parent corporation, ITW, in this court and commencing a new action against CITW in Canada even though the respective causes of action are interrelated. Both defendants are represented by the same able New York and Chicago attorneys and there is no reason to believe that CITW's interests will not be as well defended in this forum as they would be in Canada.

Defendant CITW's motion to dismiss the complaint as against it and to quash the service of process made upon it is in all respects denied.

So ordered.